POSNER, Circuit Judge.
The Association of Administrative Law Judges (its cumbersome official name is given in the caption) is a union that, so far as relates to this case, represents the Social Security Administration’s administrative law judges in collective bargaining with the Administration, pursuant to the Federal Labor-Management Relations Act, 5 U.S.C. §§ 7101 et seq. The Association, together with three administrative law judges employed by the Social Security Administration, are the in this suit, which, though the named is the head of the Administration, is really a suit against the Administration itself because she is being sued in her official capacity.
The plaintiffs contend that, by requiring its administrative law judges to decide at least 500 social security disability cases.a year the Administration has interfered with the administrative law judges’ decisional independence, in violation of the Administrative Procedure Act, which provides that when conducting a hearing an administrative law judge is not subject to direction or supervision by other employees of the agency that he is employed by and may not be assigned duties inconsistent with his duties and responsibilities as an administrative law judge. 5 U.S.C. §§ 554(d)(2), 3105.
In October 2007 the Social Security Administration’s chief administrative law judge issued a directive setting as a “goal” for the administrative law judges that each one “manage their docket in such a way that they will be able to issue 500-700 legally sufficient decisions each year.” (When the directive was issued, 56 percent of the administrative law judges were deciding fewer than 500 cases a year.) Although it is described as a goal, the plaintiffs claim in their 37-page, 126-paragraph complaint that the Administration has taken formal and informal disciplinary measures to enforce it, so that it is in effect an enforceable and enforced quota. The purpose of the goal or quota is to reduce the backlog of disability cases.
The district court dismissed the complaint for want of subject-matter jurisdiction, holding that the Civil Service Reform Act of 1978 (sections of which are scattered throughout title 5 of the U.S.Code) precludes the plaintiffs’ resort to the Administrative Procedure Act. The Civil Service Reform Act creates remedies for “prohibited personnel practices” taken against federal employees, and defines “personnel practices” to include “significant change in duties, responsibilities, or working conditions.” 5 U.S.C. §§ 2302(a)(1), (2)(A)(xii), *404 (b). Subsection (b) has a long list of the prohibited personnel practices, most of which are various types of discrimination. The district judge ruled that the plaintiffs were alleging a “significant change in duties, responsibilities, or working conditions,” and if this is correct, their exclusive remedy is under the Civil Service Reform Act. It is correct. Increasing an employee’s production quota changes his or her duties and responsibilities, and therefore working conditions. But the plaintiffs have no remedy under that Act either, even if they’re right that the challenged order is a quota rather than a goal, because the Act does not prohibit an increase in a production quota unless the increase violates a prohibition listed in 5 U.S.C. § 2302(b), and the increase challenged in this case does not.
The plaintiffs argue that because it takes less time for an administrative law judge to award social security disability benefits than to deny benefits, because an award is not judicially appealable and therefore the administrative law judge doesn’t have to be as careful in his analysis of the disability claim (doesn’t, in short, have to try to make his decision appeal proof), the effect of the quota (as we’ll call the “goal,” thus giving the plaintiffs the benefit of the doubt) is to induce administrative law judges to award more benefits: were it not for the quota, they would deny benefits whenever they thought the applicant wasn’t entitled to them under the law, even if making that determination took a lot of time. The argument is thus that the quota alters the administrative law judges’ preferred ratio of grants to denials of benefits and by doing so infringes their decision-making independence.
The argument would have merit if the Social Security Administration had imposed the quota because it wanted a higher rate of benefits awards, but that is not contended. If the result of the quota is that the percentage of such awards has risen — and in fact there is evidence that the administrative law judges who decide the most cases per year also award benefits in a higher percentage of their cases than do the administrative law judges who decide fewer cases per year — this is not contended to be an aim of the quota, but an unintended and presumably unwanted byproduct. Because the social security disability insurance trust fund is on the verge of being exhausted, see Rachel Greszler, “Social Security Disability Insurance Trust Fund Will Be Exhausted in Just Two Years: Beneficiaries Facing Nearly 20 Percent Cut in Benefits,” Aug. 1, 2014 (The Heritage Foundation, Research ), www.heritage.org/research/ reports/2014/08/social-security-disabilityinsuraneetrust-fundwill-be-exhausted-injust-two-yearsbeneficiaries-facing-nearly20-percent-eut-in-benefits, the Social Security Administration is under pressure to reduce, not increase, the aggregate disability benefits that its administrative law judges award — which in 2012 was $137 billion. U.S. Social Security Administration, Office of Retirement and Disability Policy, Annual Statistical Supplement, 2013, “Highlight and Trends,” www.ssa. gov/policy/docs/statcomps/supplement/ 2013/highlights.html. (Both websites were visited on Jan. 10, 2015.) The aim of the quota is to speed up decision-making rather than to prod administrative law judges to grant more applications for disability benefits.
Of course any change in work duties, responsibilities, or working conditions might affect an administrative law judge’s decision-making. Beyond some point, increasing a worker’s quota is going to induce him to spend less time on each task. If he is a worker on a poultry processing assembly line and the conveyor belt that carries the chickens to his work station for *405 deboning is speeded up, he will spend less time deboning each chicken than he might think desirable to make sure no bits of bone are left in the chicken when it leaves his work station on the conveyor belt. In other words, the quality of his output would decline. Yet he would not be heard to claim that his decisional independence was being compromised. His situation would parallel that of the administrative law judges. The time pressure on him would result in a reduction in the quality of his work. Similarly, the plaintiffs allege that because of the quota, the quality of the administrative law judges’ work decreases because they grant benefits in cases in which, had they more time, they would have denied benefits; the quota thus affected their decision-making.
Suppose the Social Security Administration hired more administrative law judges, thus reducing the workload of each one. With less pressure to grant benefits in order to make the quota, the administrative law judges might, because they were spending more time on each case, increase the fraction of benefit denials. But who would argue that increasing a work force is an actionable interference with the workers’ decisional independence?
In the 1960s and 1970s there were very steep increases in federal court caseloads, and increases in the number of judgeships lagged. So each judge had to work harder. Maybe some judges responded by dismissing more cases earlier than they would have preferred to do. Would this have meant that by failing to increase the number of judges in proportion to the increase in caseload, the government was interfering with federal judges’ decisional independence? The answer is no, and it is no here as well, and were it otherwise the courts would be flooded with cases brought by civil servants complaining that, as an incidental and unintended effect of a change in their working conditions, they had decided to reduce the amount of effort they devoted to each task they were assigned. An incidental and unintentional effect of a change in working conditions is not actionable under the Administrative Procedure Act.
We are mindful that the District of Columbia Circuit, in Mahoney v. Donovan, 721 F.3d 633 (D.C.Cir.2013), went even further, ruling that any action alleged to interfere with an administrative law judge’s decisional independence is a personnel action governed exclusively by the Civil Service Reform Act even though that Act provides no remedy for personnel actions that interfere — even that intentionally interfere — with decisional independence. That ruling, if sound, would nullify the express protection of such independence in the Administrative Procedure Act. We doubt that it’s sound but need not pursue the issue in this case. The other cases cited in Judge Ripple’s concurring opinion do not involve claims relating to the infringement of decisional independence. But we are mindful of his suggestion that administrative law judges whose decisional independence is interfered with by their superiors might have a constitutional remedy. Although the suggestion opens up a rather frightening vista of constitutional claims by administrative law judges employed by the federal government, of whom some 1400 are employed by the Social Security Administration alone, we can imagine a case in which a change in working conditions could have an unintentional effect on decisional independence so great as to create a serious issue of due process. Suppose that solely for the sake of administrative efficiency the Social Security Administration ordered that disability hearings were to last no more than 15 minutes. The quality of justice meted out by the administrative law judges would be dangerously diminished. But all that mat *406 ters for the decision of the present case is that the administrative law judges’ remedy under the Administrative Procedure Act for interference with their decisional independence does not extend to the incidental consequences of a bona fide production quota.
Affirmed.